## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

| | |
|---|---|
| ABDIEL ECHEVERRIA,        ) | |
|            ) | |
|     Plaintiff,       ) | |
|            ) | Civil Action |
| v.                 ) | File No.  CV123-0013 |
|            ) | |
| GEORGIA WASTE SYSTEMS, INC. ) | **JURY TRIAL DEMANDED** |
| WASTE MANAGEMENT, INC.,    ) | |
| and LORI VIDETTO, in her      ) | |
| individual and official capacities, ) | |
|            ) | |
|     Defendants.    ) | |

---

## COMPLAINT FOR DAMAGES

Plaintiff, ABDIEL ECHEVERRIA, *pro se*, submits the following Complaint for Damages against Georgia Waste Systems, Inc., Waste Management, Inc., (hereinafter collectively as "WMI"), and Lori Videtto (hereinafter "Videtto"), individually and in her official capacity, (hereinafter all collectively referred to as "Defendants"), to recover all permissible damages under controlling federal law. Defendants violated Mr. Echeverria's rights pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981, to be free from racial discrimination regarding Mr. Echeverria's compensation, promotions, terms, conditions and privileges of employment.

## NATURE OF COMPLAINT

### 1.

Plaintiff brings this action to recover damages against Defendants Georgia Waste Systems, Inc. and Waste Management, Inc., in violation of his civil rights and for their unlawful retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq* ("Title VII"), and for damages as to all Defendants named herein for violation of his civil rights and for unlawful retaliation under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").

## JURISDICTION AND VENUE

### 2.

Plaintiff invokes the jurisdiction of this court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) and 42 U.S.C. § 2000e-5(f).

### 3.

All Defendants are subject to specific jurisdiction in this Court over the claims asserted in this action. In addition, the acts and omissions that give rise to Plaintiff's claims occurred in this District. Accordingly, venue in this Court is proper pursuant to 29 U.S.C. §1391 and 42 U.S.C. §2000(e)-5(f).

## PARTIES

### 4.

Plaintiff is a Hispanic/Latino male, an American citizen of the United States of America, and a Resident in this district and is therefore subject to the jurisdiction of this Court.

### 5.

Defendant Georgia Waste Systems, Inc. is qualified and licensed to do business in Georgia, and at all times material hereto has conducted business within this District.

### 6.

Defendant Waste Management, Inc. is based in Houston Texas and is qualified and licensed to do business in Georgia, and at all times material hereto has conducted business within this District.

### 7.

Defendant Waste Management, Inc. and Georgia Waste Systems, Inc. may be served with process by delivering a copy of the summons and complaint to its current registered agent, The Corporation Company (FL), 289 Culver Street S., Lawrenceville, GA 30046.

### 8.

Defendant Lori Videtto is a District Manger for Georgia Waste Systems, Inc.

and may be served with process at her place of business at 208 Prep Phillips Drive, Augusta, Georgia 30901.

## ADMINISTRATIVE PROCEDURES

### 9.

Plaintiff timely filed charges of discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC") on April 16, 2022.

### 10.

Upon Plaintiff's request, the EEOC issued Plaintiff a Notice of Right to Sue on January 30, 2023, with respect to Plaintiff's EEOC Title VII Charges against Georgia Waste Systems, Inc., entitling an action to be commenced within ninety (90) days of receipt of the notices. **[EXHIBIT 1].**

### 11.

This action has been timely commenced.

## FACTUAL ALLEGATIONS

### 12.

Defendant Waste Management, Inc. d/b/a Georgia Waste Systems, Inc. are now, and at all times relevant hereto, been an employer subject to Title VII and Section 1981 and has strict policies[1] and procedures purportedly against discrimi-

---

[1] Defendant WMI's "Speak Up" policy allegedly encourages employees to speak up against racism, discrimination and retaliation.

nation, harassment and retaliation [**EXHIBIT 2**].

13.

Plaintiff is a Hispanic/Latino male and belongs to a protected class.

14.

Plaintiff began his employment with Defendant Waste Management, Inc. in Melbourne, Florida as a residential driver/helper on November 9, 2004. In 2017, Plaintiff was promoted to Route Manager in Cocoa, Florida.

15.

Plaintiff requested a transfer with WMI and began his tenure in Augusta, Georgia on December 1, 2019.

16.

When Plaintiff arrived to the Augusta, Georgia site at 208 Prep Phillips Drive, Defendant Lori Videtto, WMI Augusta District Manager, had only been employed with WMI since March 2019, barely nine (9) months. Defendant Lori Videtto was previously employed with Augusta Richmond County.

17.

Upon Plaintiff's arrival at the Augusta site, Plaintiff was astonished to find that there was no structure whatsoever, no schedules posted for drivers, or no order or structure for all the morning launches or corporate processes in procedure, all of which should've already been in place pursuant to WMI policies, regulations and

procedures. Plaintiff proceeded to implement these necessary and required WMI procedures because Mrs. Videtto was oblivious of her duties as a WMI District Manager ("DM") at that time. Even though it was Mrs. Videtto's responsibility as DM, Plaintiff assisted Mrs. Videtto in her duties and structured all the drivers, created efficiency goals, implemented a post-trip lane because there wasn't one at this site, implemented proper pre-trip process for all lines of business, created proper launch signals, set an example on proper driver coachings and how to identify proper coaching opportunities to maximize efficiency and safety in all areas, in addition to his commercial route manager duties[2]. Plaintiff was so knowledgeable and structured that both route managers on site initially assumed that Plaintiff was from the WMI corporate office.

18.

The first few months at the Augusta site, Defendant Videtto benefited greatly from Plaintiff's knowledge and dedication. However, Jamal Denson[3] was already allegedly experiencing discrimination from Defendant Lori Videtto when Plaintiff arrived and he often told Plaintiff to be careful because Mrs. Videtto was a racist. Plaintiff had no idea at that time that he would also become a victim of Mrs. Videtto's racism. Plaintiff just thought it might just be a personal issue between Denson and Videtto and didn't think much of it at first. Nonetheless, the harass-

---

[2] Plaintiff received no acknowledgemnt from Mrs. Videtto for assisting and teaching her duties.
[3] Mr. Denson was the residential route manager when Plaintiff arrived and was not hired by Mrs. Videtto. Mr. Denson was already at the Augusta site prior to Mrs. Videtto's arrival.

ment by Videtto against Mr. Denson continued to escalate and Mr. Denson had to move his office upstairs to escape Mrs. Videtto's harassment. Mr. Denson would tell Plaintiff how Videtto would call him a liar and often critique his managing style, among other things. Mr. Denson told Plaintiff about the ongoing harassment but told Plaintiff that he was afraid to file a grievance with WMI's Ethics Hotline because he was concerned that he was going to lose his job with WMI due to retaliation especially since he was requesting a transfer with WMI to Atlanta. On the other hand, Michael[4] was treated favorably by Mrs. Videtto.

19.

After Jamal's departure[5], approximately August 2020, the residential route manager duties, which were substantial, had to be fulfilled. There was no replacement in place for Jamal when he left[6]. Michael Finnegan, Roll-off Route Manager, refused to equally share the load for residential and Defendant Videtto was perfectly fine with Michael refusing to do so. Plaintiff was then forced by Defendant Videtto to fully assume the vast Residential Route Manager duties along with his Commercial Route Manager duties as well which Videtto alleged would only be for a "short while". As a team player, Plaintiff accepted what he believed to be the short-term responsibility believing that it would be three to four weeks at the most

---

[4] Roll-Off Route Manager also referred to as "Mike". Mr. Michael Finnegan is a white male.
[5] Jamal's departure was at the beginning of the quarter.
[6] Mrs. Videtto was aware of Jamal's departure weeks ahead of time yet she did not post the residential manager position before or after he left.

especially since there was already qualified candidates on site for the residential route manager position. Defendant Videtto promised the Plaintiff that he would also receive the full bonus for residential in addition to his commercial bonus for the quarter. Upon information and belief, Mrs. Videtto did not post the residential route manager position after Jamal left.

20.

A few weeks turned into months and the Plaintiff continued to work two full time jobs as Commercial and Residential Route Manager with no end in sight. Mrs. Videtto had not yet posted the residential route manager position and deceived Plaintiff with the promise of two full bonuses since he was working both jobs after all but instead, Plaintiff received a smaller bonus than before. Plaintiff was losing money **[EXHIBIT 3]**[7]. Plaintiff was the first person to arrive at the site[8] and usually the last person to leave, working approximately eighty (80) hours weekly with two supervisor duties, driving routes at times in both Georgia and South Carolina due to always being short on drivers, and working many Saturdays while similarly situated Michael continued to lead a normal life with no additional burden placed upon him by Defendant Videtto except for placing the cart route in order for residential every morning which would take him approximately fifteen (15) minutes.

---

[7] Please note the difference and drop in wages from 2020 to 2021 which proves loss of income.
[8] Plaintiff would wake up at 2:00 am every morning and arrive at work before 3:00 am.

21.

As time went by, Plaintiff continued to ask Defendant Videtto when was she going to hire a new residential route manager and Defendant Videtto would reply: *"Soon"*.

22.

After the residential route manager position was finally posted approximately six (6) months later in March 2021, Mr. James Robinson[9], African-American driver at the Augusta site, applied for the position. Mr. Robinson was very knowledgeable with the residential routes and assisted the Plaintiff in becoming familiar with the residential routes for South Carolina. However, Defendant Videtto hired a white man named Robert Martin instead who was also a driver but nowhere as qualified or as responsible as Mr. Robinson. To add insult to injury, Defendant Videtto then told Mr. Robinson that he had to train Robert Martin regarding the residential routes. Robert Martin only lasted a few days and resigned from WMI shortly thereafter and Plaintiff remained with Residential Route Manager duties without any additional pay and losing bonus money. Even after Robert Martin left the job after only a few days, Defendant Videtto still did not interview or hire Mr. Robinson for the position and chose to continue exploiting the Plaintiff instead and did not re-post the route manager position. Defendant Videtto would respond to the

---

[9] Mr. James Robinson recently resigned from WMI due to racism and denials of advancement.

Plaintiff when he would complain about the continuous exploitation: *"You can handle it"*.

23.

Plaintiff continued to be exploited and like a broken record, continued to ask Mrs. Videtto when was a new residential route manager going to be hired. She then began a new excuse: *"After the merger/acquisition[10]"*. Furthermore, Plaintiff continued to be deceived by Defendant Videtto and still did not receive two (2) full bonuses for doing both jobs. Who was benefiting from the remaining bonus money that Plaintiff worked so hard for?

24.

Plaintiff also had to work all Saturdays during the holidays while Mrs. Videtto and Mr. Finnegan enjoyed time off with their families. Plaintiff was the only manager working some paid holidays or holiday weekends. Mr. Finnegan or Videtto would not work Saturdays but Plaintiff did. Furthermore, Plaintiff was not able to take all of his vacation or personal time because of the vast amount of workload that was forced upon him.

25.

Plaintiff remained over-stressed, overworked, extremely tired, and many times dozed-off at the wheel driving home because of the lack of sleep and rest

---

[10] Defendant WMI d/b/a Georgia Waste Systems, Inc. was in the process of acquiring the Grovetown Georgia site from Advanced Disposal.

thereby endangering his life. Plaintiff told Defendant Videtto numerous times that he was so exhausted from working so many hours that he has fallen asleep while driving and Mrs. Videtto would respond: *"I guess you have to leave earlier then"*, to which  Plaintiff replied: *"How am I supposed to leave earlier when I am doing two (2) jobs and after many months, no one qualified is hired to offer me any relief and Michael leaves early all the time? Please hire someone very soon"*. Mrs. Videtto just didn't care and would not respond. Plaintiff had no personal life whatsoever. Plaintiff's wife and children remained in Florida because they did not have the money to move yet but he could no longer travel to Florida to visit his family on a weekend because of the extreme hours, limited monetary funds, limited time and lack of rest. The Plaintiff was denied valuable and necessary time with his family for an extended period of time for which not only was he never compensated for but continued to lose money and was never treated fairly. Defendants were saving an entire annual salary, benefits and bonuses at Plaintiff's expense, approximately $100,000.00 or more.

26.

Plaintiff continued to complain to Mrs. Videtto about being overworked and for not hiring a qualified candidate for residential so that he can finally go back to doing his regular job as commercial route manager, get some normal rest and spend much needed time with his family. Plaintiff also asked Mrs. Videtto why he

was only getting half (1/2) bonus for commercial and half (1/2) bonus for residential[11] instead of two (2) full bonuses for doing two (2) entire jobs all this time and why wasn't he receiving combo-manager pay for doing two entire jobs for a prolonged period of time. Mrs. Videtto told Plaintiff: *"I'll look into it"*[12].

27.

Thereon after, Defendant Lori Videtto then began to tell Plaintiff that there would be a "great opportunity" for him in Grovetown (Augusta West) after the merger because there would be an opening for Operations Manager there. After deceiving the Plaintiff numerous times so far, Plaintiff still believed Mrs. Videtto and didn't realize it at the time that it was just another ploy to keep him entertained with hope so that Defendant Videtto could continue exploiting him to help the Augusta site numbers and benefit financially at his expense with a higher bonus for herself for saving money on an entire salary, benefits and bonuses.

28.

On Friday April 2, 2021, Plaintiff left to Florida on a late flight after working that day to finally move his wife and children to Georgia after finally closing on a home and with some funds to move. However, the Friday night flight was much more expensive. Plaintiff was expecting to leave a few days prior, midweek, but now also had to pay more than twice the amount for the moving truck on

---

[11] The way the residential bonus is structured, it reduced Plaintiff's overall bonus substantially.
[12] As usual, Defendant Videtto never looked into it and never updated Plaintiff.

a weekend day because Mrs. Videtto refused to allow Plaintiff to take two days off during the week[13]. Plaintiff arrived in Florida early Saturday, after 1:00 am. Plaintiff, his wife and children packed most of their items in the moving truck on Saturday April 3rd. Early on Easter Sunday at 4 am, April 4th, the Plaintiffs and his family made the six (6) hour trip back to Georgia with the moving truck[14]. They unloaded every thing from the moving truck that same day but could not do much after that. Plaintiff was exhausted, still working eighty (80) hours and tired from moving but was forced to go back to work the following day on Monday and was not given the opportunity of taking the day off the next day to unpack and do stuff that they still needed to do. However, Mr. Finnegan was eventually provided days off for closing on his new house and for moving along with many special perks such as paid stays in nearby hotels and much more that were never provided to the Plaintiff.

29.

The Plaintiff spent a lot of time away from his family after they arrived to Georgia in April 2021 because he was still working around eighty (80) hours weekly. Plaintiff would arrive home, take a shower, eat and go straight to sleep. Mrs. Videtto was made aware by the Plaintiff within days after arriving at the Augusta site in December 2019 that he had a wife with numerous medically documented ail-

---

[13] Plaintiff had numerous personal days available.
[14] The Plaintiff left property in his home in Florida but did not have the funds or time to rent another moving truck and most of the items that remained were stolen.

ments and disabilities and two children with special needs, all of which were disabled pursuant to the American with Disabilities Act ("ADA") but Mrs. Videtto disregarded Plaintiff's special situation and she only afforded special privileges and accommodations to her white managers. Nonetheless, Plaintiff continued to work both jobs as commercial and residential route manager.

30.

Unbeknownst to the Plaintiff, the racism by Mrs. Videtto had already commenced when she maliciously exploited Plaintiff while not demanding no where near the same effort, requirements, hours[15] or work load from a similarly situated white employee, Michael Finnegan. Mrs. Videtto highly favored Michael over Plaintiff and would often humiliate Plaintiff, micromanage and scrutinize everything Plaintiff would do.

31.

Sometime after The 2021 Masters Tournament[16], the awaited Operations Manager position for Grovetown[17] was finally posted. Plaintiff applied for the position as an "internal" applicant and was confident that he was highly qualified for the position. Plaintiff received confirmation emails regarding his internal application and Defendant Videtto was also notified of his application **[EXHIBIT 4].** The

---

[15] Plaintiff's base pay was salary. Plaintiff did not get paid overtime.
[16] Defendant WMI services The Masters Tournament in Augusta every year and Plaintiff has worked hard preparing for the Masters and Plaintiff has attended The Masters to work.
[17] 5734 Columbia Rd, Grovetown, GA 30813.

promotion would afford Plaintiff the opportunity to move up in the company, get out of some debt, which much of the debt was obtained because of reduced bonuses[18], moving expenses, additional household expenses and to provide necessary medical treatments for his family. The promotion would provide Plaintiff's household an additional $20,000.00 (approximately) or more in much needed salary/income and an additional five percent (5%) bonus. Plaintiff was the only breadwinner in his household and Mrs. Videtto was fully aware of it.

32.

In June 2021, Mrs. Videtto interviewed the Plaintiff for the Operations Manager position. Plaintiff later realized that the interview was nothing more than a ploy when during the interview, Mrs. Videtto showed Plaintiff the resume of another applicant and practically rubbed it in the Plaintiff's face and was gushing at the other applicant's resume. At that time, Plaintiff found her fascination rather disturbing but knew he was the most highly qualified applicant especially when he had proven over and over again that he could clearly handle overseeing an entire site and had the managerial experience, fortitude and seniority to do so. Nevertheless, Plaintiff asked Defendant Videtto during the interview if he was actually being considered for the Operations Manager position, since he noticed that she was so obsessed with the outside candidate, and she evaded to answer his question.

---

[18] Plaintiff would utilize much of his bonus money to liquidate or reduce credit card debt and pay other expenses or medical bills for procedures.

33.

The following two weeks after the interview, Defendant Videtto would evade the Plaintiff as much as possible while he was still waiting for Mrs Videtto to advise him about the promotion. Shortly thereafter, Mrs. Videtto advised the Plaintiff that she hired someone else that was "over-qualified" for the position. Mrs. Videtto hired the applicant who's resume she was disturbingly obsessed with. Plaintiff was understandably emotionally destroyed at the disheartening news and felt abused and violated after working so hard. Plaintiff couldn't believe what he was experiencing. Plaintiff was one of the top leaders in performance in the South Atlantic Market Area and was still denied the promotion. Plaintiff was maliciously deceived once again by Mrs. Videtto and he continued to work both jobs and the residential route manager position remained unposted.

34.

Days later, Mrs. Videtto advises the Plaintiff that the Operations Manager position was "too easy" for him. She also had an "oh well, too bad" type attitude and shrugged after Plaintiff told her that she deceived him and that she knew he needed the promotion and that he worked hard for it.

35.

On July 19, 2021, Plaintiff asked Defendant Videtto once again why she never gave him combo-manager pay for doing two jobs for so long or two full bonuses

as promised. She provided no answer. Plaintiff told Mrs. Videtto he would give her a few days for an answer if not he would have to follow the chain of command. Later this month, Defendant Videtto became too preoccupied spending time with her new white outside hire for Operations Manager of Grovetown, Ross Minton.

## 36.

For many weeks after being denied the promotion, Mrs. Videtto repeatedly requested that Plaintiff needed to "mentor" Ross Minton if he wanted to "prove" that he was ready for the next step. Plaintiff responded to Defendant Videtto that he shouldn't have to mentor a person who was selected over him that she deemed was "overqualified" for the job and that he was already overwhelmed doing both residential and commercial duties. Plaintiff found this request irrational because Videtto hired an outside applicant[19] with no experience in the waste industry who never even proved that he could "mentor" anyone as a requirement before he was chosen for such a high-level position. Mrs. Videtto would become upset when Plaintiff would question her motives and thereby further exposing her deceitful excuses.

## 37.

On August 3, 2021, Plaintiff spoke to Mrs. Videtto's boss, Jerome ("Jay") Orzech, WMI Director of Operations South Atlantic Market, in person when he visited the Augusta site. Plaintiff expressed to Mr. Orzech how upset he was that he

---

[19] Hiring an outside applicant for a position instead of a current qualified WMI employee is cause for filing a complaint with the ethics hotline. Plaintiff could not even hire an outside applicant for a commercial driver position over an internal candidate.

was unjustifiably passed over for the Operations Manager position and how he was still being exploited by Mrs. Videtto, spent little time with his family and was losing money. Mr. Orzech expressed to the Plaintiff that he was shocked that Mrs. Videtto did not give him the promotion. Plaintiff told Mr. Orzech that Mrs. Videtto has given him four (4) different reasons to date for denying him the promotion for Operations Manager which he knew were not valid: 1. the outside hire (Ross Minton) was "overqualified"; 2. the job was "too easy" for Plaintiff; 3. the Plaintiff didn't know financials[20]; and 4. *"the opportunity for you is here in Augusta"*. Mr. Orzech admitted to Plaintiff that none of those excuses were the reason Mrs. Videtto told him that she did not give Plaintiff the promotion. Mr. Orzech did not want to tell the Plaintiff what Mrs. Videtto told him. Plaintiff also complained about the ongoing exploitation. Mr. Orzech said to Plaintiff: *"I'll look into it"*.

38.

Later this month (August 2021), Mrs. Videtto advises Plaintiff that she finally hired someone for the Residential Route Manager position and that she was submitting the offer to Human Resources ("HR"). By this time, it has already been almost one (1) full year that Plaintiff was doing residential manager duties without any compensation. Defendant Videtto refused to tell Plaintiff who she hired when he asked. Plaintiff was aware of at least one qualified applicant on site (James Rob-

---

[20] Financials was not a requirement for the Senior Operations Manager position but Mrs. Videtto didn't ask Plaintiff in the interview if he knew financials, which he did, because her mind was already made-up before she interviewed the Plaintiff.

inson, African-American) who applied again in July 2021[21] when the residential route manager position was posted again. When Plaintiff asked Defendant Videtto if she actually interviewed Mr. Robinson, Mrs. Videtto responded: *"I couldn't find his application[22]"*. By now, Plaintiff was suspecting that Mrs. Videtto was in fact a racist because of not only her history of hiring only white managers but also because for a long period of time, she exploited him, deceived him and treated the Plaintiff differently than Michael, a similarly situated employee who is white. However, Plaintiff wanted to confirm who Defendant Videtto hired for the residential route manager position before accusing her of racism.

39.

On October 15, 2021, the new residential route manager starts in Augusta. His name is Chris Fox and he is as Plaintiff suspected, white. Mr. Fox was a residential driver from the Augusta West (Grovetown) site. Plaintiff had to train Mr. Fox by himself while continuing with both manager duties. Later this same day, Defendant Videtto wasted no time and embarrassed Plaintiff in front of his white similarly situated coworkers (Micheal Finnegan and Chris Fox) and accuses the Plaintiff in an angry tone of trying to force Mr. Fox to conduct the morning meetings before he was ready to do so which was not true. Mrs. Videtto did not privately discuss or confirm this information with the Plaintiff ahead of time and directly

---

[21] Defendant Videtto waited four (4) months to post the residential manager position again.
[22] James Robinson told the Plaintiff that he received confirmation emails of his application from Defendant WMI.

accuses him publicly instead. She chose to believe Mr. Fox because he is white and found that humiliating the Plaintiff, a minority, was gratifying in front of her white managers in attendance.

40.

On October 18, 2021, there was an MOR[23] meeting[24]. Mrs. Videtto spent the entire meeting covering-up the incompetence of Ross Minton, the white outside hire who she deemed was "overqualified". The Grovetown site was doing horribly at the helm of Mr. Minton and Mrs. Videtto was deceitfully masking the disaster, something that she would never do for the Plaintiff if she had to. At all times, Mrs. Videtto would consistently defend Ross no matter what he did. Mrs. Videtto even made Ross "second in command" of both sites.

41.

On October 21, 2021, at around 6:30 am, Defendant Videtto publicly accuses Plaintiff in front of his co-workers of taking a red light and said: *"I saw you, I saw you! You took the red light!"* Plaintiff was confused because he was not even driving the truck, he was just a passenger and the driver he was with did not take the red light either. False public accusations and harassment against the Plaintiff became the norm from Mrs. Videtto. Mrs. Videtto did not treat Mr. Finnegan or Mr. Fox this way, quite the contrary.

---

[23] Monthly Operations Report.
[24] Unless otherwise specified, the acts described herein occurred at the Augusta site at 208 Prep Philips Drive.

42.

On October 28, 2021, Plaintiff spoke to Defendant Videtto about publicly humiliating him and also asked her to please provide the reason that she gave Jay Orzech for denying him the promotion. Mrs. Videtto then told Plaintiff that he lacked the ability to "adapt and change". Plaintiff could not believe his ears. Yet another illogical excuse. Plaintiff asked her to elaborate but she didn't do so and Plaintiff told her that a person that doesn't adapt and change would not be able to do the work he's done for the site since his arrival or be able to manage two (2) entire stressful jobs[25]. Plaintiff then asked Videtto how she knew that Ross Minton, an outside hire, had the ability to "adapt and change" before she hired him, her response was: *"I didn't know"*. As time progressed after Mr. Fox's hire, more and more drivers advised Plaintiff that Mrs. Lori Videtto was in fact a racist and that she would never promote him because "she only promotes white people".

43.

On December 13, 2021, Freddie Davis, driver at the Grovetown site, approaches Plaintiff while visiting the Augusta site and tells Plaintiff that he really wanted to work in his department in Augusta but that Ross Minton allegedly told him that he wouldn't want to work with Plaintiff because they would "butt heads". Freddie also advised Plaintiff that Ross slanders Plaintiff with several drivers, with

---

[25] By this time, Plaintiff was still training Chris Fox and had already covered the residential route manager job without pay and losing bonus money for about fourteen (14) months.

management and in front of Defendant Videtto and that she would support the slander. Mr. Davis also alleged to Plaintiff that Mrs. Videtto was a known racist in her previous job and advised Plaintiff that he also applied for the Residential Route Manager position twice and that Mrs. Videtto interviewed him once and never gave him the job and she gave it to Chris Fox instead. Plaintiff was not aware that multiple qualified minorities applied for the same residential route manager position and that Mrs. Videtto chose to continue exploiting him instead of hiring any of the qualified African-American internal applicants. Mr. Davis also told Plaintiff that there are rumors that Mrs. Videtto and Ross Minton are likely related.

44.

On December 13, 2021, Plaintiff filed his first official corporate grievance, a statutorily protected activity, against Defendant Lori Videtto for racism and for wrongfully denying him the promotion. Plaintiff called WMI's Integrity Hotline to file the grievance. Plaintiff provided a list of three (3) witnesses[26] that were African-American and who were also victims of discrimination by Mrs. Videtto. Plaintiff followed all proper company procedures according to the "Speak Up" policy. This same day, Plaintiff also filed an online inquiry with the EEOC.

45.

On December 15, 2021, WMI's investigator, Betty Tang, contacts Plaintiff

---

[26] James Robinson, Freddie Davis and Patrick Fenner. Patrick Fenner was a route manager at Grovetown but was not hired or promoted by Mrs. Videtto. Mr. Fenner was already a route manager with Advance Disposal before the WMI acquisition.

over the phone and asks him numerous questions. Plaintiff advised the investigator that he had a journal/timeline[27] that had more details of dates and incidents by Mrs. Videtto. Plaintiff emailed his journal/timeline document to the investigator.

46.

Once the corporate grievance was filed by the Plaintiff, Defendant Videtto further intensified her harassment against the Plaintiff. Plaintiff's office was right across the hall from Mrs. Videtto's office. Plaintiff could see Mrs. Videtto clearly while sitting at his desk. Videtto would slam her door more frequently when Plaintiff was speaking on the phone, roll her eyes at Plaintiff, give dirty looks, and huff and puff every time Plaintiff would speak to her unless she needed his assistance. Plaintiff's voice has also frequently annoyed Defendant Videtto for quite some time because of his ethnicity.

47.

On December 17, 2021, Plaintiff becomes aware that the new residential route manager hire, Chris Fox, a similarly situated employee, is allowed to do many things by Mrs. Videtto that she never allowed the Plaintiff to do. Months earlier while covering residential, Plaintiff had pitched an idea to Mrs. Videtto that would allow the residential drivers to come in earlier at 3:30 am instead of 4:15 am so that the launches could be united and the residential work load could be caught-

---

[27] There are more events that occurred and more details of what transpired in Plaintiff's journal. The journal was commenced months after the exploitation began. Plaintiff will eventually file this journal under seal.

up and the Plaintiff would save approximately thirty (30) to forty-five (45) minutes of time in the evening. Mrs. Videtto emphatically told the Plaintiff: *"No! We're not doing that"*. Now, Mrs. Videtto was allowing and accommodating Mr. Fox to do exactly what Plaintiff was forbidden to do and even moved up Plaintiff's commercial launch later to further assist Mr. Fox by uniting both launches. Mrs. Videtto had a different set of rules for the Plaintiff as a Hispanic and would purposely sabotage Plaintiff to make his job more difficult than it already was, such as consistently not providing Plaintiff enough drivers to cover routes while providing Mr. Finnegan and Mr. Fox more drivers than they needed.

48.

On December 23, 2021, Mr. Patrick Fenner, African-American, advised Plaintiff that weeks prior to Defendant Videtto interviewing the Plaintiff for the Operations Manager position for Grovetown, he witnessed Mrs. Videtto already parading Ross Minton around the Grovetown[28] site introducing him to all the managers as her "friend". Mrs. Videtto allegedly had already hired Ross Minton behind the scenes or at the very least promised him the job against company policy and before the position was even posted. The Operations Manager, Ferlin[29], was still at the site when this occurred. Mr. Fenner also advised Plaintiff that he and another site manager named Chris Reece[30], also African-American, would have applied for the

---

[28] The Grovetown site is now known as Augusta West.
[29] Ferlin was retiring and was supposed to be replaced by a qualified experienced candidate.
[30] Mr. Reece was not hired or promoted by Mrs. Videtto.

Operations Manager position but Mrs. Videtto advised them not to bother with applying for the position because "the company is going younger". Mr. Fenner and Mr. Reece are older gentleman in their late 40's or 50's and were obviously not the right color/race for the position. Plaintiff was beyond disgusted at Mrs. Videtto's discriminatory, abusive and deceitful behavior towards him after exploiting him for so long. Defendant Videtto interviewed Plaintiff for diversity purposes only because he was a minority but he was never going to get the promotion anyway.

49.

On January 10, 2022, Chris advises that his son has Covid-19 so he was told not to come in to work for that week. However, Chris was not required to work from home by Mrs. Videtto but Plaintiff did work from home when he was sent home the prior week for displaying Covid symptoms. Plaintiff had to cover Chris' duties. More preferential treatment by Mrs. Videtto for her white managers.

50.

On January 24, 2022, Plaintiff was advised that the corporate investigation was completed. Plaintiff was emailed a closing letter by WMI Investigator Betty Tang. **[EXHIBIT 5]**. The letter stated that Plaintiff's claims were "unsubstantiated". In response, Plaintiff emails Mrs. Tang dissatisfied about the findings and Plaintiff copied Jim Fish, WMI CEO, on all emails **[EXHIBIT 6]**.

51.

Plaintiff was told on February 1, 2022 by a driver, that Ross allegedly gloats and tells everyone at the Grovetown site that his annual base salary is $90,000.00[31] plus twenty (20) percent bonus[32]. If true, that would be $23,000.00 more in just base salary than what the Plaintiff was making at the time Ross Minton was hired which would've provided Plaintiff much needed monetary relief as the only income in his household.

52.

On March 21, 2022, Plaintiff sent an email to Lori Videtto and copied all managers to advise of one of the trucks that keeps breaking down. Mrs. Videtto scolded Plaintiff because he copied the Fleet Manager (David Shulman, white) on the email and she told Plaintiff that it seemed like he was "throwing Dave under the bus". Mrs. Videtto was overreaching and judgmental towards Plaintiff and searches for any opportunity to target and humiliate Plaintiff publicly which makes her feel powerful over a minority. Plaintiff was the only manager allowed to be humiliated. Plaintiff was the only Hispanic/Latino WMI employee in the district which is composed of two (2) sites, Augusta and Augusta West.

53.

On April 5, 2022, Plaintiff advises Defendant Lori Videtto that he will be go-

---

[31] Human Resources approved this salary for an outside hire without experience in the waste industry.
[32] Plaintiff's bonus was 15%.

ing tomorrow to The Masters Tournament to check the new truck and review the current layout so that he can be prepared for Thursday, April 7, 2022 so that everything runs smoothly. Defendant Lori Videtto becomes agitated and responds: *"No!! I don't want you there. The COO John Morris will be there tomorrow!"* Plaintiff was disgusted at her vicious response because he immediately realized that she didn't want Plaintiff, a loyal seventeen (17) year WMI employee at that time, in attendance because COO John Morris and the rest of her invitees are white and Plaintiff is of Hispanic/Latino ethnicity. Plaintiff responds to Videtto saying that he knows that she doesn't want "his kind" present at The Masters with the COO in attendance because it might "tarnish" her image. Plaintiff basically called her a racist yet Defendant Videtto did not deny it but then begins to make up an excuse that she needs Plaintiff at the site for morning launches. The launches are very early in the morning (3:30 am, 4:15 am and 5:30 am) and Mrs. Videtto would be at The Masters hours later at around 9:00 am. Plaintiff sent an email to the WMI investigator, telling her about this racist incident. Plaintiff also copied WMI CEO Jim Fish on this email **[EXHIBIT 7]**.

54.

On the morning of April 6, 2022, Ross Minton shows up at the Augusta site where Plaintiff works. Ross Minton (white) tells Plaintiff that Lori Videtto told him to meet her there to go with her to The Masters Tournament so that he could meet

COO[33] John Morris and take pictures with him. Ross was barely eight (8) months with the company at the time. This added insult to injury for the Plaintiff after seventeen (17) years of loyal service at the time with WMI. Plaintiff was utterly disgusted especially after accusing Mrs. Videtto directly of discrimination the previous day, she didn't even attempt to hide her racism and disdain for Plaintiff. A picture[34] of WMI's The Masters Tournament all-white cast on April 6, 2021 was later posted on WMI's COO John Morris' LinkedIn page. No minorities were allegedly present to meet or take pictures with WMI's COO. Minorities were only there behind the scenes working and receiving no recognition because that's how Defendant Videtto likes it. **[EXHIBIT 8].** Plaintiff then received a call this afternoon from Human Resources advising that they will call the Plaintiff this coming Friday for more details of The Masters racist incident by Defendant Videtto. The Masters incident was a direct act of discrimination against the Plaintiff by Defendant Videtto that occurred eleven (11) days before Plaintiff filed his charge with the EEOC.

55.

On Friday April 8, 2022, Plaintiff received a call from WMI's head investigator asking about The Masters incident. Plaintiff told the investigator what happened and how Videtto was discriminating and retaliating against him and gave the investigator a list of witnesses that could corroborate Plaintiff's claims of racism

---

[33] Chief Operating Officer.
[34] From left to right: Michael Finnegan, Ross Minton, Lori Videtto, and on the extreme right, COO John Morris.

by Defendant Videtto. The WMI investigator, Katherine Carlson, had the audacity of asking Plaintiff if he actually had any witnesses that were "white". Plaintiff answered: *"Why do you need white witnesses? Are minorities as witnesses not good enough? Wouldn't it be difficult for me to give you a list of white witnesses that benefit from the racism or that are not being discriminated against but could lose their jobs for being a witness[35]?"* Plaintiff was appalled by this racist line of questioning by the actual WMI investigator.

56.

On April 14, 2022, was Plaintiff's quarterly review. Defendant Videtto met with the Plaintiff in her office at approximately 8:30 am. Mrs. Videtto told Plaintiff that she was giving him an "Effective" rating which is basically a mediocre performance grade. Plaintiff has had consecutive "very strong" ratings but was never given "outstanding" for performing two (2) entire jobs and making extreme personal, monetary and physical sacrifices. Plaintiff asked Defendant Videtto why she was giving him such a low rating and Mrs. Videtto told Plaintiff that he needs to work on his "communication". Plaintiff has never been told that he has communication issues. Defendant Videtto never met with Plaintiff before this review regarding his communication. Defendant Videtto when questioned told Plaintiff that he has to have "consideration when speaking to people" and that he "wasn't empathet-

---

[35] Plaintiff has at least two (2) white witnesses but they will be revealed during discovery.

ic". Plaintiff asked Defendant Videtto to provide an example and she could not. Plaintiff then asks Videtto: *"Is this so-called communication issue because I speak Spanish and speak louder and differently than whites because I am a Hispanic[36]?"* Videtto did not respond to his question, stutters and then says: *"You have to learn how to manage Ross"*. Plaintiff asks Videtto that what does managing Ross have to do with what he just asked her or with anything else regarding this review when Ross is in a higher position than him and why is this a factor for an "effective" score. Defendant Videtto has been coercing Plaintiff for months to mentor Ross Minton who she alleged was "overqualified" for the position so that Plaintiff can prove he was ready for the "next level". After a long conversation and several deceitful excuses by Videtto, Plaintiff asks Videtto again why she gave him a mediocre review. Videtto now comes up with a new excuse and tells Plaintiff that he didn't complete two (2) courses. The courses were ten (10) minutes each and the Plaintiff had already completed those courses a while ago. Even so, Plaintiff asked Mrs. Videtto that why would she wait to tell him now about the courses and not before this review and told her he would have completed them again if he had to so that it wouldn't affect his review. Videtto did not respond. Mrs. Videtto had no legitimate reason for the mediocre score, was discriminatory towards Plaintiff in her review meeting and was retaliating against Plaintiff after his corporate complaints

---

[36] Plaintiff would at times speak on the phone in his office in Spanish with customers that did not speak English or occasionally with family members that only speak Spanish and Mrs. Videtto would always get up, look at Plaintiff with disgust and slam the door of her office closed.

against her, even after he was recently performing two (2) stressful jobs without even a "thank you" from Mrs. Videtto **[EXHIBIT 9]**. However, Michael, Roll-off Route Manager, scored a "very strong" by Mrs. Videtto in his quarterly review. Michael was given a "very strong" review from Videtto in this quarter despite being on a "final warning" for breaking a "life critical rule" just a couple of months prior. Defendant Videtto gave him a "very strong" during a final warning because he is white and was helping Ross Minton. Plaintiff's review was also retaliation and an adverse action because this review affects bonuses and pay raises as it remains on Plaintiff's record. Defendant Videtto accusing Plaintiff of issues with communication and lacking empathy without an explanation is an attack on his ethnicity and an act of discrimination. This review occurred nine (9) days after Plaintiff emailed WMI investigator about The Masters Tournament incident and two (2) days before Plaintiff filed the upcoming EEOC charge.

57.

On April 16, 2022, Plaintiff had an appointment and spoke to the EEOC investigator and files an EEOC Title VII charge **[EXHIBIT 10]** against Defendant Georgia Waste Systems, Inc. for racism based on national origin, ethnicity and retaliation. Plaintiff had already updated his EEOC online inquiry **[EXHIBIT 11]** with the most recent incidents[37] of discrimination that occurred with The Masters

---

[37] In Georgia, a discrimination charge must be filed "within 180 days of the last discriminatory act." 42 U.S.C. § 2000e-5(e)(1); *H&R Block*, 606 F.3d at 1295. The Masters Tournament incident on April 5, 2021 and the review on April 14, 2021 were the last or most recent discrimination incidents before the charge was filed on April 16, 2021.

Tournament on April 5, 2022 and the quarterly review meeting on April 14, 2022 which was also an adverse action. Plaintiff advised the EEOC investigator of what occurred during his quarterly review just two (2) days prior, which both occurred earlier this same month. Plaintiff uploaded the charge on the EEOC portal.

58.

Defendant Lori Videtto's belligerent discriminatory conduct continued to intensify against the Plaintiff and Defendant WMI did nothing to correct it after multiple complaints. Therefore, when Patrick Fenner is transferred to the Augusta site, Plaintiff offered Patrick and his assistant his office right across from Defendant Videtto so that he can escape a very hostile work environment caused by Videtto and other white managers supporting and benefiting from her behavior towards the Plaintiff. Plaintiff told Mrs. Videtto that Patrick could have his office. Mrs. Videtto did not give Plaintiff a direct order not to do so.

59.

On his way home from work on April 26, 2022, Plaintiff was demanded by Lori Videtto on the phone to go into work the next morning on April 27, 2022 to go over the MHN driver list. It seemed odd that Videtto couldn't wait until the following day because Plaintiff had to attend a Safety Conference in Columbia, SC. On his way to the safety conference, Plaintiff had to detour and stop by and see Mrs. Videtto which was delaying his arrival time to the conference. When he ar-

32

rived, Defendant Videtto started speaking to Plaintiff about the list and not making any sense and was apparently trying to delay the Plaintiff from leaving. At first Plaintiff thought she was just doing it to frustrate him to make him late to the safety meeting because she would often do wicked things like this to him. Then, she told Plaintiff to close the door because she was calling WMI's Human Resources ("HR") on a conference call because Plaintiff changed his office upstairs. Defendant Videtto was buying time to get on the phone with HR. She called Tammie Hoffman (white) from Human Resources on a Microsoft Teams call. The call occurred approximately from 6:30 am - 7:00 am. Tammie immediately starts the call by directly accusing Plaintiff of "insubordination" for changing offices. Lori Videtto, was physically present on the call and initiated the call. Tammie could have easily asked to hear Plaintiff's side of the story first before accusing him directly of insubordination but she didn't and willingly acted with pure bias, hatred and retaliation. Plaintiff asked Tammie how was he being insubordinate. Tammie told Plaintiff that he went upstairs after Lori told him not to do so. Plaintiff responded to Tammy telling her that that is not what happened. Plaintiff told Tammie that he already told Lori that he would give Patrick and his assistant his office before she left on Thursday. Plaintiff then asked Tammie what company policy did he violate. Tammie could not tell him. Plaintiff told Tammy that he was willingly giving up his office downstairs for Patrick and his assistant because they are new here and

there is not enough room downstairs for all of them. Tammie continued accusing Plaintiff of insubordination and Plaintiff responds that he was very aware of the definition of the word and that it wasn't insubordination because he was not disobeying a direct order and he attends all meetings and does his job and communicates with Videtto and his co-workers all day. Plaintiff told Tammie that this is clearly retaliation because of all the discrimination complaints he filed with corporate since December 2021 against Mrs. Videtto and that he has a logical and lawful reason to go upstairs because he has been discriminated against by Mrs. Videtto for quite some time and he wanted to remove myself from a very hostile work environment because of the horrible treatment he's consistently received from Lori Videtto and just wants to do his job without being surrounded by constant harassment and hostility. Videtto was right there and at no time did she deny Plaintiff's accusations of racism against her on this call and she remained quiet. Tammie then tells Plaintiff that "there will be consequences" and asked him if he understood that. Plaintiff responded: *"No, please explain to me what the consequences are for changing offices because of a hostile work environment"*.  Tammie responded: *"Lori is the leader of that site and what she says goes"*. While Plaintiff is still speaking, Tammie keeps interrupting Plaintiff and says: *"Andy, Andy[38], do you understand what I am telling you? You're being insubordinate and there will be consequences. You have*

---

[38] Plaintiff goes by the name Andy.

*to move your office back today!"*. Tammy kept repeating: *"There will be conse-quences"*. Tammie and Lori Videtto threatened Plaintiff numerous times on this call. Plaintiff was maliciously ambushed by Mrs. Videtto and Mrs. Hoffman who were both in cahoots attempting to terminate Plaintiff's employment. Plaintiff was forced to move back downstairs, across from Mrs. Videtto once again and continue to suffer Mrs. Videtto's hostility and racism just so he wouldn't lose his job. In addition, Michael Finnegan told Plaintiff that he deserved to be fired after Plaintiff told him what transpired with Videtto and Hoffman. Videtto was utilizing Human Resources Department as a weapon against the Plaintiff and to reach other objectives and agendas. Plaintiff then proceeded to send an email to HR People Director Doran Anderson[39] explaining to him what transpired earlier that day and pleading for help. Mr. Anderson responded to Plaintiff's email and said he would be at the Augusta site to talk to Plaintiff on May 3, 2022. **[EXHIBIT 12]**. Plaintiff filed and uploaded a retaliation charge with the EEOC regarding this incident. **[EXHIBIT 13]**.

60.

On April 28, 2022, WMI investigator Katherine Carlson, white, calls Plaintiff at approximately 3:00 pm. about the recent insubordination incident. Mrs. Carlson justifies Mrs. Videtto and Mrs. Hoffman's behavior and told Plaintiff that it

---

[39] Mr. Anderson is African-American and Plaintiff believed that Mr. Anderson would understand as a minority but sadly that was not the case.

wasn't retaliation even though his job was threatened after several statutorily pro-
tected grievances were filed. Mrs. Carlson practically accused Plaintiff of violating
company policy but didn't specify which and ignored Mrs. Videtto and Mrs. Hoff-
man's behavior. Plaintiff told Mrs. Carlson that it seems that illegal racist activity
is encouraged and supported for some privileged members at WMI. Every investi-
gation became more and more retaliatory and biased.

61.

On May 3, 2022, Mr. Doran Anderson met with Plaintiff in person at the Au-
gusta site. Kim Stavropulos[40] accompanied him. Plaintiff told Mr. Anderson every-
thing that transpired since the beginning and even cried out of frustration because
he was so emotionally abused by Videtto and he could not understand why this was
happening to him because all he wanted was a better life for his family and was
faced with abuse and racism instead. Mr. Anderson advised Plaintiff to contact
Kim Stavropulos instead of Tammie Hoffman moving forward. Plaintiff thought
that maybe something might finally change after months of complaints.

62.

On May 13, 2022, Chris Fox starts mocking Plaintiff in front of Defendant
Videtto and calls him "Abdul Enchilada". Mrs. Videtto laughs hysterically at the
nickname mocking Plaintiff's name and ethnicity and does not reprimand Mr. Fox.

---

[40] HR People Manager South Atlantic Area.

Mr. Fox often said racist remarks to the Plaintiff and Plaintiff usually laughed it off or ignored it but this time Plaintiff felt that it crossed the line because of Mrs. Videtto's reaction as a District Manager who has already been accused of racism by the Plaintiff. Plaintiff files a grievance for the racist remark but focuses more on the behavior and reaction of Mrs. Videtto condoning the racist remark. Shortly thereafter, WMI investigator Katherine Carlson calls Plaintiff to get details of the incident involving Mrs. Videtto and Chris Fox. On this call, Mrs. Carlson questions and responds to everything Plaintiff tells her with sarcastic remarks and basically justifies Mrs. Videtto's reaction and starts victim blaming. Plaintiff was upset that he was being gaslighted into believing that he was in the wrong. WMI's "Speak Up" policy is a farce especially in the South Atlantic Market area.

63.

On June 1, 2022, Plaintiff receives a call from WMI investigator Katherine Carlson. She wanted to speak to Plaintiff about the results of the most recent investigation regarding The Masters Tournament incident. Mrs. Carlson told Plaintiff that his claims were "unsubstantiated" once again. Mrs. Carlson told Plaintiff that what occurred wasn't racism and that he was not allowed to "practice" ahead of time and that he had to "be quiet" at The Masters. Plaintiff was already aware of that and had already worked at The Masters since 2020 and has routinely practiced the route ahead of time and surveyed the area for any changes yet he was not al-

lowed to be present this time while COO John Morris was in attendance. Defendant Videtto's actions were discriminatory and WMI continued to support her racist behavior. A closing letter was issued. **[EXHIBIT 14].**

64.

On June 30, 2022, Georgia Waste Systems, Inc. filed their position statement in response to the Plaintiff's EEOC Charge. In Defendants WMI/Georgia Waste System's position statement, Plaintiff was wrongfully labeled as "aggressive" and "combative" and alleged that this is mostly the excuse for Plaintiff being denied a promotion. However, Plaintiff was never labeled as aggressive and combative before by WMI or by any of his supervisors in Florida and there is also no documentation of Plaintiff being "aggressive" or as a reason for him being denied a promotion. Ironically, the person chosen for Operations Manager instead of the Plaintiff is allegedly very aggressive. WMI also alleged that Plaintiff's complaints were "thoroughly" investigated. Defendants' EEOC position statement was replete with falsehoods and defamatory allegations against the Plaintiff **[EXHIBIT 15]**. Defendants' false allegations against the Plaintiff ultimately surpassed the perimeters of their EEOC position statement and Plaintiff began to be labeled as "aggressive" and "a real assh*le" by other Grovetown drivers who didn't even personally know the Plaintiff but were just repeating rumors allegedly started by Ross Minton[41] and

---

[41] Mr. Ross Minton would frequently tell Mr. Bobby Taylor: "I hate that damn guy", "he's an asshole", "I hate his f*cking guts", and other demeaning phrases when referring to the Plaintiff.

Lori Videtto thereby further ruining his reputation[42]. Plaintiff had been nothing but an exemplary, responsible. knowledgeable and dedicated employee with WMI. **[EXHIBIT 16]**.

65.

On July 5, 2022, Freddie Davis, African-American and commercial driver for WMI Grovetown (Augusta West) site, submitted his resignation letter. Mr. Davis' resignation letter read as follows:

> *To: whom it may concern*
>
> *From: Freddie A. Davis*
>
> *I am submitting my letter of resignation to Waste Management effective July 11, 2022. I thank you for the opportunity given to me by Waste Management but a much better situation has been presented to me. If the opportunity under different circumstances and/or leadership were to ever to arise, I would welcome the chance to return to Waste Management.* ***With the present leadership the ability to advance will never be a leveled playing field for individuals who look like me and this has been a very disturbing experience.*** *I took the job with Advanced Disposal when I was informed Waste Management was purchasing the company, I also was the biggest defenders of this company, telling coworkers things would be better for them, only to be the one individual who has been* ***mistreated and disrespected*** *throughout the whole process the most. In my 12 years with Waste Management, I've never seen leadership this inadequate representing this fine company and I'm terribly disappointed with this last experience.*
>
> *Sincerely yours,*

---

[42] This slander against Plaintiff ultimately went beyond Waste Management and also reached drivers for local competitor Coastal Waste.

*Freddie A Davis*

Mr. Freddie Davis applied for the residential route manager position in Augusta twice and so did Mr. James Robinson who is also African-American. Mr. Davis was interviewed once by Defendant Videtto but the position was given to Chris Fox instead.

66.

In a meeting on July 11, 2022 with Videtto (Patrick, Mike, Chris and Plaintiff were all present), Videtto allowed Chris Fox to utilize Lori Longbottom (white residential swing driver) to cover a route for Chris after giving Plaintiff specific instructions the previous week that no matter what the Augusta Richmond County Contract[43] had to be covered. Plaintiff asked Videtto: *"Why are we changing things all of a sudden and now accommodating Chris after he returned from vacation after you told me something else last week while I was covering for Chris? Why do Patrick and I get different treatment?"* Videtto responded: *"I'm not trying to do that"*. Plaintiff responded: *"Yes you are. This is now hurting Patrick who is covering ARC (Augusta Richmond County contract) and we will get fined[44]"*. Patrick (African-American) jumped in and said: *"Yeah. You said that when Andy ran that department last week. That was the plan and you told everybody here. What are we*

---

[43] ARC. Mr. Patrick Fenner was the route manager covering ARC.

[44] Defendants deemed Plaintiff "combative" because he would question Videtto's favoritism, motives and abuse against him. Speaking up or defending himself is considered combative.

*doing here?"* Videtto didn't respond to what Patrick said and changed the conversation. Both Plaintiff and Patrick questioned Mrs. Videtto on her racist favoritism for white managers.

### 67.

On July 13, 2022 was Plaintiff's quarterly review once again. Plaintiff's review was via Microsoft Teams with HR People Manager Kim Stavropulos present. This time, Plaintiff received a "very strong" rating. At first, everything seemed fine but as the meeting progressed, Defendant Videtto found the need to critique Plaintiff. Defendant Videtto told Plaintiff that he had to react better under pressure. Plaintiff then asked Mrs. Videtto to elaborate what she meant by that and Defendant Videtto would stutter and was not able to explain. Mrs. Stavropulos then jumped in to save Mrs. Videtto and actually explained what Mrs. Videtto apparently meant. Obviously, Mrs. Videtto and Mrs. Stavropulos had already discussed this ahead of time. Plaintiff asked Mrs. Videtto to provide him with just one example or scenario in which he was not able to handle pressure and Videtto couldn't come up with any and she told him that she would get back with him when she remembered[45]. Ironically, the person that Videtto alleged had to learn how to handle pressure better was the same person that handled two (2) entire stressful jobs working approximately eighty (80) hours weekly, lost time with his family and without any

---

[45] Mrs. Videtto never provided Plaintiff a response regarding a scenario.

additional pay while Mrs. Videtto and her white managers reaped the benefits. Mrs. Videtto also told Plaintiff during this quarterly review meeting that he had to "learn how to manage me and Ross" to get to the next level. Mrs. Videtto also told Plaintiff to "keep managing up" and to "keep practicing" and "that opportunity will come along", an opportunity that already came along and that Mrs. Videtto unjustifiably denied the Plaintiff, continuously obstructed from Plaintiff's reach and that was never going to happen.  However, Ross Minton, a white outside hire, did not have the same requirements needed for the Operations Manager position that was being  demanded or imposed upon the Plaintiff. At no time during this quarterly review meeting did Defendant Videtto or Mrs. Stavropulos advise or admonish the Plaintiff for being "aggressive" or "combative". Plaintiff has an audio recording of this quarterly review meeting which was twenty-six (26) minutes long.

68.

On July 15, 2022, Plaintiff was on a route with one of his commercial drivers[46]. The Driver advised the Plaintiff that he has personally witnessed discrimination at the Augusta site and that he personally knows drivers that are also being allegedly discriminated and intimidated by Ross Minton in the Augusta West (Grovetown) site but that they are afraid to speak up because they were afraid to lose their jobs. Plaintiff told the driver to tell the victims to file complaints in writing with

---

[46] Driver is African-American. Driver's name withheld at this time for fear of retaliation. Driver is currently employed by Defendant WMI.

WMI corporate because this flagrant racism is against the law. Driver later advised Plaintiff that the victims have no idea how to file the complaints and need guidance. Many of the African-American drivers and managers were already there before the WMI acquisition and expressed that the racist culture started when Lori Videtto and Ross Minton became in charge of the site. As a victim himself, Plaintiff felt compelled and obligated to advocate for these victims and prepare a document as a guide that they could complete, sign and file with WMI's corporate office and Human Resources ("HR"). The Driver also advised Plaintiff that Mrs. Videtto had a history of racism at the Augusta Richmond County Landfill and that he knew several of her victims[47]. Unbeknownst to the Plaintiff at that time, Defendant Videtto was already accused of racism in this very district court while employed with Augusta Richmond County. (See ***Howard v. Augusta Richmond Cnty. Comm'n,*** **Case No. CV 117-079**[48]). To the detriment of the Plaintiff and other WMI victims, Defendant WMI failed to properly vet Mrs. Videtto, who was an outside candidate when hired, and was already involved in a racial discrimination lawsuit.

---

[47] Plaintiff was already told about Mrs. Videtto's history of racism by drivers at the Augusta site, some of which will be disclosed at the time of discovery to avoid any retaliation against these drivers by WMI.

[48] The Plaintiff in the lawsuit referenced herein, Lori Ann Howard, an African-American woman, filed her Title VII complaint against Augusta Richmond County alleging discrimination after an all white panel of three (3), lead by then Deputy Director Lori Videtto (Defendant), denied Ms. Howard and another African-American woman a promotion in which she was more qualified and Videtto hired a white woman who was less qualified instead. Ms. Howard initially lodged a complaint with Richmond County's Equal Employment Office which determined that Ms. Howard's complaints of discrimination were "substantiated". Ms. Howard's *pro se* Title VII complaint was eventually dismissed in March 2019 because she did not exhaust her remedies under Title VII.

69.

While Plaintiff was still training Bobby Taylor[49] (African-American Route Manager at Augusta West) at his site in July 2022, Plaintiff was approached by many drivers that were victims of discrimination and Plaintiff eventually gathered a few signed documents by some victims of racism that were previously afraid to speak up. Most of the victims spoke to the Plaintiff but did not complete documents because they were afraid to do so. The intimidation against the victims was overwhelming. Those who did complete a document, did so out of their own free-will telling their own personal experience of discrimination in their own handwriting and their own signatures. The victims that spoke up felt that by filing corporate complaints, WMI would now do what was right according to the law.

70.

On the morning of July 28, 2022, one of Ross Minton's alleged victims who did not file a complaint, became frightened and told Ross Minton that Plaintiff was gathering signed victims' statements to file with WMI corporate. Bobby Taylor allegedly witnessed Mr. Minton become very irate, throwing things and he even asked Bobby, who is allegedly also one of Minton's victims, why was everyone telling on him. Mr. Minton then proceeded to take Bobby Taylor's cell phone by force and proceeded to call numerous victims and asked them individually if they

---

[49] Bobby Taylor was a route manager with Advance Disposal before the WMI acquisition but was never actually trained with WMI and Defendants did not even bother to properly train him so Plaintiff volunteered to do so.

"snitched" on him and threatened them one by one. Mr. Minton[50] was allegedly obstructing his victim's rights and threatening them not to speak. Later that day at 12:18 pm, Plaintiff sends the mass email to WMI corporate investigator Katherine Carlson, WMI CEO Jim Fish, HR Kim Stavropuos and the Director of Operations Keith ("Eric") Wakefield with the signed discrimination complaints attached, and as an advocate for these victims, which is also a statutorily protected activity[51]. **[EXHIBIT 17]**.

## 71.

On July 29, 2022, Plaintiff filed his rebuttal to Defendants' position statement with the EEOC.

## 72.

On August 4, 2022, a purported "independent" investigator named Jack Stapleton, who admitted to Plaintiff of being an attorney contracted with WMI for the past ten (10) years, was assigned to allegedly conduct a "fair" investigation regarding the mass complaint filed by the Plaintiff on behalf of the victims and other pending matters alleged by the Plaintiff[52]. Mr. Jack Stapleton met with the Plaintiff and asked the Plaintiff if he was recording the meeting and the Plaintiff admitted

---

[50] After all the discrimination complaints and policy violations against him, as of the date of this complaint, Mr. Ross Minton continues to be employed by WMI as Senior Operations Manager of Augusta West.

[51] Plaintiff also advised Defendant WMI of Mr. Minton's alleged aggressive and abusive behavior after he became aware of the incoming complaints and Defendants also vindicated Mr. Minton after his alleged gross behavior.

[52] Defendants had alleged in their EEOC position statement filed on June 30, 2022 that a "thorough" investigation was conducted regarding Plaintiff's claims.

that he was because he didn't want his rights violated. Mr. Stapleton told Plaintiff that the meeting had to stop and would continue at another time and warned Plaintiff not to record when they met again.

73.

The following day, August 5, 2022, the "independent" investigator/attorney who was paid by WMI, returns to the Augusta site to speak to Plaintiff. Plaintiff did not record this meeting because Mr. Stapleton forbid him to do so but truly wishes he would have. During this meeting/interview, Mr. Stapleton was consistently victim-blaming the Plaintiff and was more interested on how the Plaintiff acquired the signed testimonies from Videtto and Ross Minton's victims than the illegal activity that actually transpired against the Plaintiff and the others. This was not a fair investigation, it was a retaliatory fishing expedition against the Plaintiff. The Plaintiff felt like he was on trial even though he did nothing wrong and was participating in a protected activity. Mr. Jack Stapleton then proceeds to ask Plaintiff if he had an "issue" with a white female driver named Lori Longbottom earlier in the week. The Plaintiff answered: *"No. Why?"*. Mr. Stapleton told Plaintiff that he was told that Plaintiff had called Ms. Longbottom a "cry-baby b*tch" and a "f*cking female driver". Plaintiff vehemently denied these false accusations. It was evident that Defendant Videtto was slandering the Plaintiff with false retaliatory accusations in her defense to make it appear that Plaintiff was behaving in a discrimi-

natory manner against a white female driver. Plaintiff knows it was Mrs. Videtto because he had only spoken to Mrs. Videtto about Ms. Longbottom possibly getting injured and advised Videtto that Ms. Longbottom was crying in pain on a day that Plaintiff was covering residential duties for Chris Fox. It would be completely irrational for the Plaintiff to give any type of ammunition against him to a purported racist that he didn't trust and who harmed him for so long.

74.

On September 9, 2022, Plaintiff sends an email to Human Resources' People Manager Kim Stravropulos and HR People Director Doran Anderson advising of favoritism/racism incident by Lori Videtto[53]. Plaintiff became aware this same day that Mrs. Videtto "fought hard" to keep Ms. Longbottom from being terminated after violating two (2) critical life rules and a recent accident. Mrs. Longbottom is a white female residential driver that Plaintiff personally hired and trained all by himself while he was covering residential. Plaintiff had no ill-will against Ms. Longbottom. However, Defendant Videtto interfered in Ms. Longbottom's eminent termination according to company policy but she was quick to terminate an African-American driver named Donald Robinson earlier for the same exact critical life rules violations as Ms. Longbottom **[EXHIBIT 18]**. Later this same day, Plaintiff spoke to Michael Finnegan and asked him if he was going to come in tomor-

---

[53] A protected activity.

row, (Saturday), the weekend after Labor Day[54], to manage his roll-off group be-cause all managers already had full days. Mr. Finnegan's response was: *"I am not working tomorrow because I got it like that"*. Plaintiff then proceeds to email Mrs. Videtto to ask her why Michael receives preferential treatment and gets to decide when he works. Plaintiff tells Mrs. Videtto that this upsets him because he (Plain-tiff) was *"left stranded here alone on-site when I was running commercial and resi-dential every time there was a long weekend. This is not ok"*. Mrs. Videtto obvious-ly denies what Plaintiff is implying and says that Mr. Finnegan was treated no dif-ferent than any other manager and that he makes arrangements for someone to cov-er RO[55] and that the option is afforded to everyone and that she will talk about it when she gets back[56]. Plaintiff responds: *"I have to respectfully disagree with your assessment. I look forward to speaking about it when you get back. Thank you En-joy"*. **[EXHIBIT 19]**. Mrs. Videtto never spoke to Plaintiff about this after she re-turned to work that following Monday after enjoying her holiday time off.

---

[54] Plaintiff was off on Monday, September 5th for Labor day but still had to work that Saturday. Plaintiff was the on-ly manager that always had to work the Saturdays after a Holiday while everyone else is off. Plaintiff is not really enjoying a day off. In addition, Plaintiff was the only one on-call every Saturday when he was off and he would of-ten be contacted to go in his own vehicle to pick up drivers that broke down for both his drivers and Michael's driv-ers, do accident scene investigations, take tools or tarps to the roll-off drivers on routes and much more while Mi-chael Finnegan enjoyed his Saturdays with his family. Plaintiff would cover all roll-off, residential and commercial routes emails as well. When Patrick transferred to Augusta, he would also go in on Saturdays after holidays.
[55] Roll-off.
[56] This is false because the only one who covers roll-off when Mr. Finnegan is off is the Plaintiff and there are no pre-arrangements, Plaintiff is just expected to do it.

75.

On September 27, 2022, Videtto publicly harassed Plaintiff with a line of
questioning in front of Mr. Patrick Fenner's assistant Latonya. After making an ap-
pearance at the transfer station in Grovetown earlier that day with driver Charles
Gunn, Plaintiff arrived at the Augusta site and was pestered and humiliated by Mrs.
Videtto because she likely believed that Plaintiff was at Grovetown to spy on Ross
Minton or to gather more victims after the mass email complaints. It is also appa-
rent that this incident and reaction was also triggered by Plaintiff's most recent
complaint on September 9, 2022 against Mrs. Videtto. Defendant Videtto repeated-
ly asked Plaintiff: *"Why did you go to Grovetown?!"* Plaintiff responded *"I had to
go there because I was training Charles Gunn who is a new driver and I wanted to
do a demo-back certification in a more controlled environment instead of the very
busy landfill".* Mrs. Videtto wasn't satisfied with Plaintiff's legitimate response
and continued to harass him with questions in front of Latonya. This type of public
harassment and humiliation by Mrs. Videtto against the Plaintiff was a frequent oc-
currence.

76.

On September 28, 2022, "independent" investigator/attorney Mr. Jack Sta-
pleton called Plaintiff via Microsoft Teams with Kim Stavropulos on the call.
Plaintiff was called to allegedly gather more information about what transpired

with Mrs. Videtto's favoritism for a white female driver which he complained to HR in an email on September 9, 2022. Mr. Stapleton asked Plaintiff many questions including if he felt that Mr. Donald Robinson's termination was supported by company policy for which Plaintiff replied "yes". Plaintiff expressed to Mr. Stapleton that his concern was not that Mr. Robinson got fired but that the punishment was vastly different for both drivers, one white and one black, and that it would set precedent moving forward because Longbottom was pardoned and other drivers would expect the same. Plaintiff advised that he had text messages between Mrs. Videtto and Mr. Donald Robinson. Mr. Stapleton asked Plaintiff how he was able to acquire texts from Mr. Robinson regarding his conversation with Defendant Videtto and Plaintiff said that he called Mr. Robinson to hear his side of what transpired and then Mr. Robinson sent the Plaintiff the text messages. Plaintiff then sent Kim Stavropulos Mr. Robinson's text messages as requested. Plaintiff has an audio recording of this call which was fifty-six (56) minutes long.

## 77.

On October 4, 2022, Defendant Videtto calls Plaintiff in a cheery voice and tells him to meet her at the Grovetown site. Because of Videtto's demeanor, Plaintiff was almost certain that she was going to ambush him with something or terminate him. When Plaintiff arrived at Grovetown[57], he had to wait a while in Ross

---

[57] Plaintiff began an audio recording before he entered the building.

Minton's office because Mrs. Videtto was in a meeting with Keith ("Eric") Wake-field (Director of Operations), Doran Anderson (HR Director), and Kim Stavropu-los (HR People Manager). After the meeting with Mrs. Videtto was finished, Mr. Wakefield and Mrs. Videtto stepped outside and Plaintiff was called into the room. Participating in the meeting was: Doran Anderson and Kim Stavropulos along with the Plaintiff. The meeting regarding the allegations begins at nineteen (19) minutes and seventeen (17) seconds into the audio recording. Mr. Anderson tells Plaintiff: *"The intent today is not to rehash or go back into what those allegations were...............we want to close out with you based on the investigation that ...by outside counseling, Jack Stapleton"*. Mr. Anderson then proceeds to tell Plaintiff that they "need his help". Mr. Anderson states that the Grovetown site, "for what-ever reason", has had a lot of issues. Mr. Anderson then states: *"As we move for-ward Andy, we want to put the past...(noise) ....we hope that we can redirect activi-ty between these two (2) sites"*. Mr. Anderson proceeds to tell Plaintiff that the in-vestigator (Jack Stapleton) was there due to the mass discrimination complaints and spoke to numerous employees. Mr. Anderson then begins to state what the de-tailed report contains but that he wasn't going to get into the specifics. Mr. Ander-son told Plaintiff *"essentially the investigation concluded that there were no sub-stantiated items[58]"*. Mr. Anderson then tells Plaintiff that he knows that Plaintiff

---

[58] The "no substantiating items" Mr. Anderson was referring to was the allegations against Defendant Videtto and Ross Minton in the mass complaint and the allegations against Mrs. Videtto for her obvious favoritism for a white female driver.

understands how to be a leader and that they will need his help to turn this place around, both sites. Plaintiff knows how to be a leader and is only good to "help" but is too loud to be the leader of a site? Plaintiff tells Mr. Anderson that nothing will change if they continue to keep and protect the persons responsible for the problems. Shortly after, Mr. Anderson basically stated that there were allegations that Plaintiff called a meeting to specifically intimidate or initiate corporate complaints while he was at the Grovetown site training Bobby and that this created some anxiety amongst other employees[59]. Plaintiff denied those allegations and stated that many employees approached him in a separate room because they were afraid of retaliation. Mr. Anderson said that "some people reported feeling uncomfortable". Then Mr. Anderson tells Plaintiff about the alleged "insensitive comments about female drivers" and that it wasn't substantiated but that Plaintiff allegedly was "extremely vocal and loud" and that Plaintiff *"said some things that you shouldn't say as a leader"*. When Plaintiff asked Mr. Anderson to elaborate to who he said these things to and what he said, Mr. Anderson responded: *"To whomever"*. Plaintiff wanted to know where this allegation came from but Mr. Anderson said he wasn't going to give him the specifics. Plaintiff tells Mr. Anderson that he knows that the same person that he's been reporting for discrimination (Lori Videtto) is the same person making these false allegations and that this is retaliatory. Audio re-

---

[59] There are federal laws in place that prohibit retaliation against employees that unionize or participate in union activities and doesn't even involve civil rights. The Plaintiff participated in a protected activity as an advocate that would protect him from retaliation under Title VII and Section 1981.

cording is fifty-two (52) minutes long. After this meeting with Doran and Kim, there was another meeting immediately after and Keith ("Eric") Wakefield, Doran Anderson, Kim Stavropulos, Defendant Lori Videtto, Patrick Fenner, Michael Finnegan, Chris Fox, Bobby Taylor and Plaintiff were all in attendance. Doran was heading the first portion of this last meeting and Kim did the second portion. They stated that they were having this meeting to fix the issues of both sites involving the massive of amount of complaints. Doran called this a "reset meeting". They wanted Plaintiff's "help" but they allowed the aggressors to continue with their current responsibilities in a position of authority with no repercussions and with no restitution for the Plaintiff.

78.

It is apparent that Defendant WMI finds Plaintiff "extremely loud and abrasive[60]" because of his ethnicity and by the way that he speaks/communicates as a Hispanic/Latino as Plaintiff had already discovered previously in Defendants' retaliatory and discriminatory position statement and through Mrs. Videtto's retaliatory quarterly reviews. However, they asked for "help" from the "aggressive", "abrasive" and "combative" Plaintiff to fix both sites after Plaintiff was still denied advancement. Even when he exceeded all expectations in job performance, he was denied the promotion. Ultimately, being purportedly loud and abrasive because of

---

[60] Ross Minton has allegedly screamed at minorities, banged on walls and tables, intimidated, abused many and had no leadership skills but he is still the WMI Senior Operations Manager because he is white.

his ethnicity is frowned upon by WMI but racism is not. Plaintiff would frequently witness similarly situated white managers scream at drivers without any repercussions or criticism from Defendant Videtto or from WMI. However, at no time before Plaintiff filed complaints did anyone meet with Plaintiff regarding his purported "aggressive" behavior and there is no documentation or write-ups of this purported aggressive behavior until the Defendants filed their position statement with the EEOC and accused him of such. The so-called independent investigation was merely a fishing expedition against the Plaintiff because the Defendants are grasping at straws and have nothing to justify the way he's been discriminated against and denied advancement by Mrs. Videtto or why Defendant WMI d/b/a Georgia Waste Systems, Inc., supported the blatant racism for so long and retaliated against him. Defendants made it abundantly clear that they were coercing the Plaintiff to just move-on after this "reset meeting" even though there was an ongoing EEOC federal investigation for the unlawful violations of Plaintiff's civil rights that consistently took place and were ongoing with no signs of abatement.

79.

On October 6, 2022, Donald Robinson spoke to Plaintiff and told him that no one from WMI or the investigator, Mr. Jack Stapleton, ever called him to get his side of the story after Plaintiff advised of Lori Videtto's favoritism in favor of a white female driver. This was obviously not properly investigated as they alleged.

80.

Since Mrs. Videtto was vindicated once again by WMI, she is free to continue her reign of terror against the Plaintiff and other minorities. On October 12, 2022, Mrs. Videtto aggressively storms into Plaintiff's office without warning and verbally attacks him. She begins to accuse Plaintiff of lying and kept telling Plaintiff repeatedly that he told Ross "an untrue statement" and did not even bother to get Plaintiff's side of the story. Mrs. Videtto apparently believed whatever story Mr. Minton told her regarding a truck that was not operational because of leaking oil by the gallon along with coolant and it was a safety hazard. Unlike Ross and Lori, Plaintiff was protecting WMI and abiding by WMI safety procedures. Therefore, Plaintiff refused to give the hazardous truck to Mr. Minton for a route in Grovetown but as soon as another truck that was safe and operational was available early that morning, Plaintiff notified Mr. Minton that he could pick-up that truck. Regardless of the effort that Plaintiff made to assist Mr. Minton that morning, Mrs. Videtto harassed Plaintiff with impunity and insulted him numerous times. Then Mrs. Videtto forced the Plaintiff to get on a route in a truck to pick-up thirty-four (34) stops with Chris Fox with a bad knee (not work-related) for which she was already aware of which just intensified Plaintiff's knee pain because of the position of the seat. Plaintiff notified Human Resources via email about the incident [**EXHIBIT 20**].

81.

Later that day on October 12, 2022 at approximately 1:00 pm, Keith ("Eric")
Wakefield and Kim Stavropulos spoke to Plaintiff via conference call. During this
call with Plaintiff, Mr. Wakefield and Mrs. Stavropulos were victim blaming and
justifying Mrs. Videtto's behavior even after admitting they had not yet spoken to
Mrs. Videtto regarding the incident earlier this same day. They were already prede-
termined to dismiss Plaintiff's complaint and take Mrs. Videtto's side. Mr. Wake-
field was bothered that Plaintiff continued to complain about Mrs. Videtto and told
Plaintiff that he is not supposed to bring-up again anything that occurred before
and that the meeting on October 4, 2022 was a "reset". Therefore, Plaintiff was ex-
pected to move-on from the federal violations committed against him, to forget all
the emotional pain and humiliation he sustained, to forget the promotion he was
unjustifiably denied due to racism and to forget all the money he lost while wit-
nessing the Defendants protect Mrs. Videtto over and over again after violating his
rights. Plaintiff was also admonished by Mr. Wakefield on this call in which Mr.
Wakefield stated that he did "not like the tone" of Plaintiff's email sent to HR[61].
There was no tone. Mr. Wakefield also expressed that he was upset that Plaintiff
spoke about his knee injury[62] in the email and that Plaintiff said that Mrs. Videtto
forced him to get on a truck which required him to place his legs in an awkward

---

[61] See Exhibit 20.
[62] Plaintiff injured his knee weeks prior after falling off a ladder while doing a building project at his home.

position causing further pain and injury. Mr. Wakefield told Plaintiff that he just should've said "no" to Mrs. Videtto and Plaintiff responded that he was already wrongfully threatened by her for insubordination and almost terminated and that she would do it again if he refused. Mr. Wakefield then told the Plaintiff that because of the knee-injury, he was not "fit for duty". Plaintiff was a supervisor and he was not required to get on a truck. However, Chris Fox was allowed by Mrs. Videtto to walk around the Augusta site in flip-flops[63] after an alleged onset of gout while Plaintiff was on vacation[64] and he was not deemed "unfit for duty". Defendants' representatives were coercing Plaintiff and blatantly interfering with Plaintiff exercising his rights on this call. Plaintiff has the audio recording of this meeting which was fifty-two (52) minutes long. Plaintiff filed a charge regarding this incident to the EEOC portal **[EXHIBIT 21].**

82.

To date, Defendants continued to intimidate, retaliate and obstruct victims from exercising their civil rights. On October 17, 2022, Anthony Graham[65], African-American helper at the Augusta West site, called Plaintiff in the afternoon to

---

[63] A safety hazard and against company policy.

[64] Plaintiff notified Ms. Videtto via text about Mr. Fox walking around outside in flip-flops which is against company policy due to safety issues. Mrs. Videtto acted surprised but in reality she was fully aware of it because she allowed him to do so when Plaintiff was on vacation. Many drivers notified Plaintiff that they saw Chris walk around for days with flip-ups in Mrs. Videtto's presence. Plaintiff has the texts and the picture of Chris wearing the flip-flops at work. More preferential treatment for white managers.

[65] Mr. Anthony Graham filed a signed complaint of discrimination which was included in the mass email complaint [Exhibit 17].

notify him that he began working again that morning and that he was told by Kim Stavropulos that he had to sign a document as a condition of his return and of the sequence of events that transpired. Mr. Graham said he agreed because he just thought it was standard procedure and that he just wanted to go back to work after months of unsubstantiated suspension. Mr. Graham told Plaintiff that when he arrived at the Augusta West site after he was finished on the route, Mr. Minton gave him the document to sign and when he read it he realized it was a "final warning" in which he basically had to admit to committing the conduct that he was allegedly wrongfully accused of and suspended for. When Mr. Graham read the document, he told Mr. Minton that he refused to sign it. Mr. Minton attempted several times to have him sign it. As a result of Mr. Graham's continued refusal to sign the final warning document admitting to the wrongdoing, Mr. Minton allegedly became very irate, punching tables, screaming and verbally forced everyone[66] out of his office. Mr. Minton then proceeded to call Mrs. Kim Stavropulos for reinforcement. Mr. Graham emailed Mrs. Stavropulos the next day on October 18, 2022 to advise of Mr. Minton's alleged aggressive behavior the previous day because he repeatedly refused to sign the final warning and said that he was not going to be intimidated into signing something that he didn't do. In the mail, Mrs. Stavropulos completely ignored what Mr. Graham advised about Mr. Minton's purported aggressive out-

---

[66] Anthony Graham, Bobby Taylor and V.J.

burst and told Mr. Graham that even though he was not required to sign the document that it will remain on his record and that he has to abide by the "code of conduct" policy that he was retrained on. Mr. Graham did not sign the document and wrote instead: "I do not agree with this write-up". There was a huge disparity in the way that WMI was applying their Code of Conduct to Mr. Graham, African-American driver-helper, than to Ross Minton, white, and the leader of the site who already had numerous complaints for discrimination and abuse filed against him. Mr. Graham alleges that he also has audio recordings. Mr. Anthony Graham provided the Plaintiff with the final warning that Defendants were intimidating him to sign along with the email conversation he had with Mrs. Stavropulos **[EXHIBIT 22]**.

## 83.

On October 20, 2022, Plaintiff went to his Primary Care Physician because of ongoing knee pain that was re-aggravated and for severe stress and anxiety. Plaintiff had an x-ray[67] and was prescribed medication for severe depression[68].

## 84.

On November 4, 2022, Plaintiff applied for a job with the City of Augusta for less pay. Plaintiff has been consistently applying for jobs for many months hop-

---

[67] Plaintiff had no fracture but it seemed to be ligament damage behind his knee but he couldn't afford an MRI.
[68] Plaintiff wanted to see a psychologist for quite some time but couldn't afford the co-payments for ongoing therapy sessions or any deductible for testing. However, Plaintiff has documentation of this doctor's visit.

ing to escape the racism and harassment by Videtto and WMI. Coincidentally days later in a meeting, Mrs. Videtto advises that the City of Augusta is now hiring enforcers to monitor waste company's production within the city limits. This is the same job that Plaintiff applied for days prior. Plaintiff now realized why he wasn't getting calls or interviews for these jobs because Mrs. Videtto has connections and was interfering and obstructing the Plaintiff from other job opportunities and likely slandering Plaintiff with other potentially interested companies[69].

85.

On November 9, 2022 was Plaintiff's eighteen (18) year anniversary with Waste Management, Inc. Every yearly anniversary used to mean something to the Plaintiff as an amazing accomplishment for loyalty and stability in his career and one year closer to retirement with WMI, but not anymore. Pursuant to a new requirement by WMI effective October 1, 2022, Mrs. Videtto was required to conduct a "stay interview" with all managers on the anniversary month of their employment with WMI. This "stay interview" with Plaintiff never occurred because Defendants did not want the Plaintiff to "stay" **[EXHIBIT 23]**.

---

[69] Months prior, Plaintiff applied for the competitor (Coastal Waste) and was called for an interview for route manager. Even though they were impressed, Plaintiff was never called back and later found out through Freddie Davis who was currently employed at Coastal Waste that Coastal drivers that Plaintiff did not know were repeating the same slander against Plaintiff started by Mrs. Videtto and Mr. Minton. Some Drivers from WMI and Coastal knew each other.

86.

On November 10, 2022, Plaintiff decided to review his "My WM Total Rewards" account. Plaintiff has previously used his My WM Rewards points frequently to redeem gift cards for Walmart, Lowes, Home Depot, etc. worth anywhere from $50 to $100 each. Plaintiff was awarded these points throughout the years by his supervisors and district managers in Florida for his performance. When Plaintiff checked his WM Rewards history, he realized that the last time he received rewards points was on his fifteen (15) year anniversary with WMI on November 9, 2019, before his transfer to Augusta, and from his District Manager in Florida along with comments and encouragement for his great work and other recognition points for safety excellence, etc. Plaintiff also has recognition certificates from WM from Pete Duddie (DM, Florida) and Mike Lewis (WM Director of Operations, Florida)[70]. Plaintiff did not received a single reward point or recognition certificate from Lori Videtto since he arrived in Augusta, Georgia on December 1, 2019, even when he was performing two (2) jobs and assisting Videtto in doing her own job and training the existing managers on site, all proven to dramatically exceed his employee duties as route manager. Mrs. Videtto didn't even have the human decency of giving Plaintiff any rewards points or recognition awards, for

---

[70] See Exhibit 16.

which she had the power to do so, even after everything he did for her and for WMI thereby proving further discrimination by Videtto. **[EXHIBIT 24].**

87.

On November 17, 2022, an MHN Metric Meeting took place via Microsoft Teams call at approximately 12:00 noon. Mrs. Videtto assigned Mr. Ross Minton to conduct the meeting. Defendant Lori Videtto was present. Bobby Taylor, African-American Commercial Route Manager in Grovetown who also filed a complaint against Ross Minton, was also present in the meeting. Mr. Minton starts asking Plaintiff about his sequence compliance, and Plaintiff told him that he has had a truck down for the past month. Mr. Minton starts to further question Plaintiff like if what Plaintiff said didn't matter. Then Mr. Minton starts questioning Plaintiff's decision-making on breaking up the routes. Mr. Minton continued to pressure Plaintiff with absurd questions just to annoy Plaintiff. Mr. Minton had no knowledge of what Plaintiff's job entailed. Mr. Minton admonishes Plaintiff and became verbally aggressive when Plaintiff questioned his experience. Mrs. Videtto then intervenes to protect Mr. Minton from becoming more aggressive. Bobby Taylor was also admonished by Mr. Minton. This was an intentional mockery by Mrs. Videtto against the Plaintiff to be admonished by the actual less qualified candidate who was selected over him. Plaintiff did not waste his time sending an email to HR regarding what transpired but did file a retaliation charge with the EEOC for this incident and

uploaded it to the portal [EXHIBIT 25]. Even though Plaintiff demonstrated extreme patience for a resolution for a long time, he was at his wit's end.

88.

On December 2, 2022 at 4:48 am, Plaintiff emailed his constructive discharge resignation letter to WMI CEO Jim Fish, Kim Stavropulos (HR), Keith ("Eric") Wakefield (Director of Operations), and to Defendant Lori Videtto. The original letter was left on Lori Videtto's desk by Plaintiff. [EXHIBIT 26]. At approximately 7:00 am, around twenty (20) minutes after Mrs. Videtto arrived, Mrs. Videtto received a phone call (Plaintiff could clearly hear what Mrs. Videtto was saying on the call) and Mrs. Videtto was laughing and very happy on the call and then she said: *"Ok, ok, I'll get it done"*. Mrs. Videtto did not even attempt to hide her joy. As soon as she was off the call, Videtto approached the Plaintiff and told him: *"I got your letter and I just got off the phone with HR and effectively immediately, your employment contract with Waste Management has been terminated"*. Their plan came to fruition. Plaintiff had to immediately turn in his work phone and laptop. This took place in the presence of David Shulman, Fleet Manager (white), and not in private because Mrs. Videtto truly enjoys humiliating the Plaintiff publicly and this was her moment to shine. Mrs. Videtto and WMI's plan to create an intolerable work environment for Plaintiff to force him to resign succeeded. After Plaintiff said some quick goodbyes, he immediately left the premises. Just

like that, Plaintiff's long tenure with WMI was over because of racism.

89.

Unlike the time when Jamal left and Mrs. Videtto posted the job many months later so she could continue exploiting the Plaintiff, Defendant Videtto wasted no time this time around in posting the vacant route manager position after Plaintiff's departure. The now vacant commercial route manager position after Plaintiff's departure was posted on December 9, 2022. **[EXHIBIT 27]**.

90.

Plaintiff eventually found another job in another type of industry but only has ten (10) percent bonus structure, travels twenty (20) miles more to and from work each way, his current benefits are very expensive and poor in comparison to his benefits with WMI, has a lot less coverage for life insurance and other benefits, less vacation time[71] and does not have access to other benefits that he enjoyed while employed by WMI. Overall, Plaintiff is now making less money because he is greatly affected by his current benefits and bonus structure. However, Plaintiff is now an Operations Manager responsible for not one, but four (4) sites. Plaintiff has proven to be more than capable and qualified to be an Operations Manager, the same type of position that the Defendants wrongfully denied him. Furthermore, he has no purported "communication" issues.

---

[71] After Plaintiff's 15 year anniversary with WMI, Plaintiff's annual vacation time was 4 weeks.

91.

As a consequence of Mrs. Videtto's and WMI's malicious acts for a pro-longed period of time, the Plaintiff was met with a declining financial situation and debt which caused him to delay medical procedures for his wife and daughter, therapy for his son, cancel appointments at times for his spouse because they couldn't afford co-payments, and caused late payments every month for utilities, mortgage and other expenses, all of which have damaged the Plaintiff and his family long term both emotionally and financially and further damaged Plaintiff's credit.

92.

Not once did Mrs. Videtto personally thank or appreciate the Plaintiff for his hard work and the forced labor she placed upon him nor was it ever her intention of promoting Plaintiff because of his ethnicity. Defendant Videtto felt that Plaintiff was not worthy of a promotion he qualified for and was beneath her and beneath her other white managers and WMI fully supported her racist behavior towards Plaintiff.

93.

Before denying Plaintiff the promotion, Defendant Videtto displayed many acts of discrimination against the Plaintiff and she would always treat similarly situated white managers favorably and provide them special accommodations for

their lifestyle. Plaintiff was not afforded these privileges even though he had special circumstances with a wife and children with special needs.

94.

Plaintiff's grievances reached the top of the corporate chain for WMI but nothing was done to correct the ongoing discrimination and retaliation against the Plaintiff or the other victims. WMI was fully complicit and also participated in the discriminatory and retaliatory behavior with planned biased investigations and intolerable work conditions that harmed the Plaintiff thereby holding WMI fully liable.

95.

Upon information and belief, Defendant Lori Videtto and Ross Minton, both accused of racism by numerous WMI employees, remain with WMI, in their positions of authority as if nothing ever happened. Defendant WMI chose to retain these individuals and support them because they are white while allowing and contributing to the abuse and discrimination towards Plaintiff to cause a constructive discharge after eighteen (18) years of employment with Defendant WMI.

96.

There is a clear pattern of intentional discrimination and retaliation by all Defendants named herein.

## CLAIMS FOR RELIEF

## COUNT I

### Race Discrimination In Violation Of Title VII Of The Civil Rights Act Of 1964

**Against Waste Management, Inc. and Georgia Waste Systems, Inc.**

#### 97.

Plaintiff reincorporates by reference paragraphs 12-96 of this Complaint by reference as if fully set forth herein.

#### 98.

Plaintiff was the only Hispanic/Latino WMI employee in the district.

#### 99.

Defendant's actions in subjecting Plaintiff to ongoing race discrimination constitute unlawful discrimination on the basis of Plaintiff's ethnicity/race, Hispanic/Latino, in violation of Title VII.

#### 100.

Defendant discriminated against Plaintiff because of his ethnicity/race willfully, wantonly, and in reckless disregard of Plaintiff's federally protected rights, and its discrimination against Plaintiff was undertaken in bad faith.

#### 101.

The effect of the conduct complained of herein has been to deprive Plaintiff of equal employment opportunities, and to otherwise adversely affect his status as

an employee because of his ethnicity/race.

### 102.

As a direct and proximate result of Defendant's violation of Title VII, Plaintiff has been made the victim of acts that have adversely affected his psychological and physical well-being.

### 103.

Accordingly, Defendants Waste Management, Inc. and Georgia Waste Systems, LLC. are liable for the damages Plaintiff has sustained as a result of Defendants' unlawful discrimination and retaliation.

### 104.

Plaintiff is entitled to punitive damages, compensatory damages, lost wages and benefits, fees and costs of litigation, prejudgment interest, back pay and front pay, and any other relief available under the law.

## COUNT II

### Retaliation In Violation Of Title VII Of The Civil Rights Act Of 1964, As Amended

**Against Waste Management, Inc. d/b/a Georgia Waste Systems, Inc.**

### 105.

Plaintiff re-alleges paragraphs 12 - 96 as if set forth fully herein.

### 106.

Plaintiff's corporate grievances, EEOC charges and advocacy on behalf of

other victims of racism employed by Defendant constitute protected activities under Title VII.

107.

Defendants subjected Plaintiff to adverse employment actions because Plaintiff engaged in protected conduct. The adverse actions (to wit, reputational harm, negative reviews, harassment, retaliatory investigations, overall reduction in pay, attempted termination, etc.) to which Plaintiff was subjected to would dissuade a reasonable employee from making or supporting a charge of discrimination.

108.

There was a causal connection between the protected conduct and the adverse actions.

109.

As a direct and proximate result of Defendant's violations, Plaintiff has suffered economic, non-pecuniary and future pecuniary damages.

110.

Defendant willfully and wantonly disregarded Plaintiff's rights, and its actions toward Plaintiff were with malice, intentional and undertaken in bad faith.

111.

Plaintiff is entitled to punitive damages, compensatory damages, lost wages and benefits, fees and costs of litigation, prejudgment interest, back pay and front

pay, and any other relief available under the law.

## COUNT III

### Hostile Work Environment In Violation Of Title VII Of
### The Civil Rights Act Of 1964, As Amended

**Against Defendants Waste Management, Inc.
d/b/a Georgia Waste Systems, Inc.**

Plaintiff re-alleges paragraphs 12 - 96 as if set forth fully herein.

### 112.

Plaintiff belongs to a protected class and was the only Hispanic/Latino employee in both the Augusta and Augusta West sites.

### 113.

Plaintiff was the subject of unwelcome harassment and the harassment was based on Plaintiff's ethnicity/race.

### 114.

Defendant subjected Plaintiff to a hostile work environment on the basis of his ethnicity/race (Hispanic/Latino).

### 115.

Defendants' malicious acts and intolerable work conditions towards Plaintiff caused a constructive discharge.

### 116.

Plaintiff is entitled to punitive damages, compensatory damages, lost wages

and benefits, fees and costs of litigation, prejudgment interest, back pay and front pay, and any other relief available under the law.

## COUNT IV

### Race Discrimination In Violation Of 42 U.S.C. § 1981
### Against All Defendants

#### 117.

Plaintiff re-alleges paragraphs 12 - 96 as if set forth fully herein.

#### 118.

Plaintiff had an employment agreement with Defendant WMI within the meaning of 42 U.S.C. § 1981, under which, *inter alia,* Plaintiff worked for Defendants, and Defendants compensated Plaintiff for work.

#### 119.

All Defendants named herein subjected Plaintiff to discrimination on the basis of his ethnicity/race as a Hispanic/Latino.

#### 120.

42 U.S.C. § 1981 prohibits Defendants from discriminating against the Plaintiff on the basis ethnicity/race with regards to making and enforcing of his employment with Waste Management, Inc.

#### 121.

Defendants named herein intentionally discriminated against Plaintiff, on the

basis of Plaintiff's ethnicity/race, in violation of 42 U.S.C. § 1981.

122.

Defendants named herein violated Plaintiff's rights under 42 U.S.C. § 1981 by denying him advancement opportunities because of his ethnicity/race.

123.

Defendants named herein treated Plaintiff differently than at least one other similarly situated employee outside of Plaintiff's protected class. Any alleged non-discriminatory reason given by Defendants for treating Plaintiff differently than another employee outside of Plaintiff's protected class is pretext for unlawful discrimination.

124.

Defendants' actions in subjecting the Plaintiff to different terms and conditions of employment or advancement constitutes unlawful discrimination on the basis of ethnicity/race in violation of 42 U.S.C. Section 1981.

125.

The effect of the conduct was to deprive Plaintiff of economic opportunities, and otherwise adversely effect Plaintiff's status as an employee, because of his ethnicity/race.

126.

Defendants made no effort in "good faith" to remedy the on-going discrimi-

nation or harm that was caused against the Plaintiff. Defendants continued to violate Plaintiff's rights despite an ongoing EEOC investigation.

127.

Defendants acted with malice or reckless indifference to Plaintiff's federally protected rights.

128.

These deliberate discriminatory acts and injuries described herein against the Plaintiff would not have occurred but-for his race/ethnicity.

129.

Defendant Lori Videtto, with WMI's full support, deliberately caused Plaintiff mental anguish, humiliation and monetary losses because of his ethnicity.

130.

As a direct and proximate result of Defendants' actions and omissions, Plaintiff has suffered damages, including lost wages, lost benefits, debt, late payments, harm to his credit, inability to afford most medical treatments, emotional distress, inconvenience, humiliation, reputational harm, and other indignities.

131.

As a direct and proximate result of Defendants' unlawful employment practices, Plaintiff has been embarrassed, humiliated, slandered and has suffered damage to his emotional and physical health, and has lost back pay and front pay

and benefits.

132.

The acts and omissions of Defendants were willful, intentional, malicious and in reckless disregard of Plaintiff's federally protected rights entitling Plaintiff to punitive damages.

133.

Defendants named herein have willfully and wantonly disregarded Plaintiff's rights, and Defendants' discrimination against Plaintiff were undertaken in bad faith.

134.

Defendants purposely chose not to take appropriate remedial steps to prevent or correct the discrimination. As can be observed by this complaint, Plaintiff gave Defendants ample time to correct the exploitation, racism and retaliation but Defendants refused to do so. Defendant WMI continuously justified and concealed the illegal acts.

135.

Defendant Lori Videtto, individually and in her official capacity, undertook her cruel and unlawful conduct intentionally and maliciously with respect to Plaintiff and his federally protected rights and by further enriching herself at Plaintiff's expense, entitling Plaintiff to recover compensatory and punitive damages against

Defendant Videtto.

136.

Accordingly, Defendants Waste Management, Inc., Georgia Waste Systems, Inc., and Lori Videtto are liable for the damages Plaintiff has sustained as a result of Defendants' unlawful discrimination.

137.

As a direct and proximate result of Defendants' violations of 42 U.S.C. § 1981, Plaintiff has suffered compensatory damages including but not limited to lost wages, lost benefits, debt; punitive damages including but not limited to emotional distress, loss of enjoyment of life, suffering, inconvenience, non-pecuniary losses, future pecuniary losses; and all other relief recoverable under 42 U.S.C. § 1981.

## COUNT V

### Retaliation In Violation Of 42 U.S.C. §1981

**Against All Defendants**

138.

Plaintiff re-alleges paragraphs 12 - 96 as if set forth fully herein.

139.

Plaintiff belongs to a protected class. Plaintiff is Hispanic/Latino.

140.

Plaintiff had an employment agreement with Defendant within the meaning

of 42 U.S.C. § 1981, under which, *inter alia,* Plaintiff worked for Defendants, and Defendants compensated Plaintiff for work.

141.

Plaintiff performed and exceeded his contractual obligations with Defendant WMI for eighteen (18) years.

142.

All Defendants named herein violated Plaintiff's rights under 42 U.S.C. § 1981.

143.

Plaintiff's complaints and opposition to racist conduct constitute protected activity under 42 U.S.C. § 1981.

144.

Plaintiff is a Hispanic/Latino who engaged in statutorily protected activity by objecting to, advocating for other victims of racism, and complaining against race discrimination prohibited by 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

145.

42 U.S.C. § 1981 prohibits the Defendants from retaliating against Plaintiff because he opposed, objected to, and complained against race discrimination prohibited by 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e *et seq.*

146.

During Plaintiff's employment with Defendants Waste Management, Inc. d/b/a Georgia Waste Systems, Inc., Defendants named herein subjected him to retaliation because he advocated for other victims and opposed, objected to, and complained against illegal race discrimination against him. Defendants retaliated against Plaintiff by taking various retaliatory actions against him including, but not limited to: (a) selectively imposing and enforcing workplace policies, practices, and procedures against him while not doing so for other similarly situated white employees and thereby making his job duties more difficult; (b) subjecting Plaintiff to negative reviews that affects future pay and bonuses, on the basis of his exercise of federally protected rights as compared to employees who did not engage in similar statutorily protected activity; (c) subjecting Plaintiff to retaliatory accusations of insubordination as precursory for termination; (d) subjecting Plaintiff to unwarranted fishing expeditions disguised as internal investigations in which Plaintiff was admonished, victim-shamed and labeled as "aggressive" and "combative"; and (e) reputational harm.

147.

Defendants subjected Plaintiff to adverse actions because of his protected conduct. The adverse actions to which Plaintiff was subjected would dissuade a

reasonable employee from making or supporting a charge of discrimination.

148.

Upon information and belief, Defendant Videtto maliciously obstructed future job opportunities for Plaintiff for many months after Plaintiff applied for other jobs and allegedly slandered Plaintiff with Defendants' competitor thereby denying Plaintiff another competitive job with similar benefits, structure, advancement and pay.

149.

There was a causal connection between the protected conduct and the adverse actions.

150.

These deliberate discriminatory, retaliatory acts and injuries described herein against the Plaintiff would not have occurred but-for his race/ethnicity.

151.

As a direct and proximate result of Defendants' violations, Plaintiff has suffered economic, future pecuniary and non-pecuniary damages.

152.

Defendants willfully and wantonly disregarded Plaintiff's rights, and its actions towards Plaintiff were undertaken in bad faith.

153.

As a direct and proximate result of Defendants' violations of 42 U.S.C. § 1981, Plaintiff has suffered compensatory damages including but not limited to lost wages, lost benefits, debt; punitive damages including but not limited to emotional distress, loss of enjoyment of life, suffering, inconvenience, non-pecuniary losses, future pecuniary losses; and all other relief recoverable under 42 U.S.C. § 1981.

## COUNT VI

### Hostile Work Environment In Violation Of 42 U.S.C. §1981
### Against All Defendants

Plaintiff re-alleges paragraphs 12 - 96 as if set forth fully herein.

154.

Plaintiff belongs to a protective class and was the only Hispanic/Latino employee in both the Augusta and Augusta West sites.

155.

Plaintiff was the subject of unwelcome harassment and the harassment was based on Plaintiff's ethnicity/race.

156.

Defendants subjected Plaintiff to a hostile work environment on the basis of his ethnicity/race, Hispanic/Latino.

157.

Defendant Lori Videtto subjected Plaintiff to an intolerable and hostile work environment that no reasonable person would tolerate by: frequently harassing him; falsely accusing him and routinely humiliating him in front of his similarly situated white co-workers and others; slander; exploiting him and subjecting him to a heavier work-load than his similarly situated white co-workers; imposing different requirements, terms and conditions upon Plaintiff for promotions and responsibilities; creating conditions to make Plaintiff's job duties intolerable which also forced him to work Saturdays just to catch-up; working many holiday weekends while other similarly situated white managers were given those holidays off; micromanaging, which was not done to other similarly situated white managers; discriminatory and retaliatory reviews; ambushes with retaliatory accusations of insubordination in an attempt to terminate Plaintiff's employment; verbal attacks; slammed doors, dirty looks and expressions of disgust when Plaintiff would speak to Videtto or when he was speaking on the phone because of his ethnicity; and by supporting all racist jokes or remarks towards Plaintiff by similarly situated white co-workers, all of which Defendant WMI was advised of by Plaintiff with emails and grievances, some of which occurred during the ongoing EEOC investigation. Moreover, the conduct was allowed by WMI to continue to the very end with no repercussions and WMI fully supported the illegal behavior to Plaintiff's detriment.

158.

Defendants' malicious acts and intolerable work conditions towards Plaintiff caused a constructive discharge after eighteen (18) years of employment.

159.

Plaintiff's constructive discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination, retaliation and hostile work environment based upon his ethnicity and for participating in protected activities.

160.

As a direct and proximate result of Defendants' violations of 42 U.S.C. § 1981, Plaintiff has suffered compensatory damages including but not limited to lost wages, lost benefits, debt; punitive damages including but not limited to emotional distress and pain, loss of enjoyment of life, suffering, inconvenience, non-pecuniary losses, future pecuniary losses and all other relief recoverable under 42 U.S.C. § 1981.

[Intentionally left blank]

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court grants:

(a) General damages for mental and emotional suffering caused by Defendants' misconduct;

(b) Special damages for lost wages, lost benefits, one year salary plus benefits, and lost bonuses;

(c) Punitive damages based on Defendants' willful, malicious, intentional, and deliberate acts;

(d) Reasonable costs and expenses of litigation;

(e) Trial by jury as to all issues;

(f) Prejudgment interest at the rate allowed by law;

(g) Declaratory relief to the effect that Defendants have violated Plaintiff's statutory rights;

(h) Injunctive relief prohibiting Defendants from further unlawful conduct of the type described herein; and

(i) All other relief to which he may be entitled.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Respectfully submitted this ____6th____ day of February 2023.

Abdiel Echeverria - Plaintiff *pro se*

756 Blythe Rd.
Hephzibah, GA 30815

Phone: (321) 750-8349

Email: andyecorso@yahoo.com